Disabled In Action Of PA v. SEPTA Disabled In Action Of PA v. SEPTA Good morning, your honor. Bennett. My name is Joe Bennett and I represent SEPTA, which was the defendant below. I would like to reserve five minutes for rebuttal. Under the Americans with Disabilities Act, Congress delegated to the Department of Transportation the authority to establish regulations for transit agencies. The regulations tell transit agencies what they must do to comply with the ADA. Here, SEPTA submits that the district court created an obligation. It's not found in the statute, the regulations, or the case law. In delegating authority to the DOT, Congress told the agency that the regulatory standards must be consistent with the minimum guidelines and requirements issued by the Access Board, which is an independent federal agency specifically charged by Congress with establishing standards for accessible design and transportation facilities. DOT's regulations state that a transportation facility complies with the ADA if the facility satisfies DOT's regulations and the board's accessibility guidelines as modified by the DOT. Can I ask you something that will help me make sure that I'm not misunderstanding what I thought the heart of your briefing was? Is it your position that accessibility issues don't have to be taken into account unless and until a structural modification is made to a facility that involves perhaps a load-bearing wall or something of that magnitude? Is that SEPTA's position? No. SEPTA is relying on a particular provision. We're not saying that's the broad-based standard, but in the guidelines at 4.1.6 Open Parens 1, Closed Parens, Open Parens F, Closed Parens, there is a particular regulation that governs the installation or replacement of stairs or escalators, and that particular provision says that major structural... Well, I'll read it to you. If an escalator or stair is planned or installed where none existed previously and major structural modifications are necessary for such installation, then a means of accessible vertical access shall be required. All right. So it seems like... Well, I don't know. It seems like you're reading into the accessibility idea the requirement that there have to have been a structural modification. Am I misunderstanding you? Well, I think that's what the regulation says. I mean, SEPTA reads this regulation to mean that where there are no major structural modifications necessary for the installation of the stair or an escalator, then there's no requirement to install an elevator. You're cabining that to this case, I gather. This case because this case involves stairs. This case involves stairs and an escalator. And then you need what Judge Jordan referred to as a... You only do it if there is a wall movement or some structural change. I think that's what the board is saying, that if you're replacing a stair or you're replacing an escalator... So when you have that situation, only when you have that situation you have to provide access. That's correct. But if you have to pave a road like in Kinney, then you do have to provide access. See, that doesn't make sense to me. Why you would have to do it there, which is to allow for a disabled to come off a curb, but when you have to provide vertical access, you don't have to accommodate. Especially since Kinney just involved resurfacing. No other alteration. Right. I think what Kinney focused on was what is the primary function of the road and determined that was an alteration. But I think in this situation... But Kinney said that resurfacing was an alteration requiring the provision of access to disabled individuals under the ADA. That's right. But what I don't understand is why you would require access in that circumstance, but when you have a change of stairs where you most need access, it doesn't apply. In the regulations governing the decision in Kinney, there were specific Department of Justice regulations that required if there was an alteration of a road, then you must install curb cuts. That was very clear. There was no, say, defense. And I think that's different here because this regulation says if you're going to replace a stair, if you're going to replace an escalator, and you don't have to have any impact on load-bearing structures, all you need to do is replace the stair or replace the escalator. The question is how you define alteration. Alteration is defined. If road surfacing is alteration, why isn't, as Judge Fuentes said, why isn't this alteration as well? Well, I think I have two points to that. I think that it's fair to say here that the stairs themselves were modified, and so the stairs were improved and are quote-unquote altered, if you will. But the question becomes at what level, if you modify one element, do you then have to modify all other elements that might be involved? And the guidelines, I think, will tell you no. I guess there's a couple of things I would point. The DOT regulations at 49 CFR Section 37.3 defines an alteration to mean remodeling, renovation, rehabilitation, reconstruction, historic restoration. And how is this, how is replacing unsafe stairs not a rehabilitation or replacing an escalator that's inoperable not a rehabilitation in the ordinary sense of that word? Your Honor, the definition of alteration in the DOT regulations and in the accessibility guidelines is substantially identical. And I think what the guidelines do is provide specific scoping and technical requirements for alterations. Section 1 of the guidelines mandates that the scoping and technical requirements are to be applied during the design, construction, and alteration of facilities covered by the ADA to the extent required by the DOT regulations. Well, Ms. Bennett, let me bring you back to my question if I can. How is the replacement of unsafe stairs and the replacement of an inoperable escalator not a rehabilitation in the ordinary sense of that word? Judge Prater thought this was, I took it, a pretty clear and obvious point. And I want you to attack her conclusion and tell me why it doesn't fit that ordinary understanding of the word rehabilitate or reconstruct. I think it does. But I think what the guidelines do is provide these specific scoping and technical requirements. And the guidelines recognize that as what I would call a single element, a stair in a particular space in an entrance may be altered and that these distinct alterations do not give rise to alter the entire space. And that is found, the support is in the guidelines. It's section 4.1.6, open parens 1, close parens, open parens F1, which basically says you can do single elements within a space may be altered and these distinct alterations do not give rise to an obligation to alter the entire space. What does usability have to do with our review here? Should we be paying attention to that? The argument you're making seems to be saying, if I'm understanding it, yes, this would be a rehabilitation and it would be a renovation under an ordinary understanding. But we have these design guidelines and they tell you something about scope that limits that ordinary meaning. Does it limit the meaning of usability? Because certainly if something is unsafe or inoperable and then you correct that, it affects the usability, wouldn't you agree? Yes, I would. And what the guidelines require a transit authority to do is it replaces that stair or that escalator to make it comply with the guidelines, quote, unquote, new construction standards. For instance, the escalator that was replaced in City Hall Courtyard had to comply with the Access Board's, quote, unquote, new standard, a new construction standard for escalators. So the wellway was extended slightly and what you did when usability was we now have an escalator that meets the ADA standards for escalators. But your point is that the guideline also limits the ordinary understanding of usability, right? I think what it does is the guidelines define what is usable in the sense that, yes, the stairs were made more usable after they were replaced. They were made more usable and to be more usable, they had to comply with the guidelines requirements for a stair. They were made more usable regardless of what any guideline said because human beings could use them when they couldn't use them safely before. So what you're saying is the guidelines have to be understood as a limitation on the usability step that's ordinarily in place in this analysis, right? Well, I think what it is, the stairs are usable. They're more usable. And you could, you know, there's never a way that somebody in a wheelchair is going to be able to use stairs. I mean, that's, you have to recognize that. But what the guidelines said is you make them usable and you did change the usability of the stairs and SEPTA met the standards for stairs. Let me ask you something about the installation of elevators and whether it's feasible or not. Are you suggesting that there is a financial component to feasibility of installation of the elevators? I sort of got that from your brief. I think that's right. And I know that... A balancing of costs, a cost-benefit balancing? I think it is. I think Congress, I think the cost-benefit analysis has been done by Congress, the DOT, and the Access Board. There's explicitly a recognition that cost factors where the alteration is to a primary function area of a facility, and a primary function area is sort of an area of the core purpose of the facility. Under the statute and the regulations, if there is an alteration to a primary function area, the public entity must create an accessible path of travel, including the installation of an elevator, to the altered area, unless the cost of doing so would be disproportionate. So 20% is that threshold there. So if you alter a primary function area, the cost of providing an accessible route to that area is capped at 20% of the cost. The district court, as I understand it, disavowed this concept, said that financial considerations are not... at least if you look at the claim that's been filed by DIA, we're not looking at a primary function area alteration at the 15th Street Station on the Market-Frankfurt subway elevated line. I'd also like to point, I think that DOT and Access Board implicitly recognize cost constraints because the guidelines saying we're not going to require you to install an elevator connecting two levels unless the replacement of the stair or the escalator requires you to make major structural changes. The only requirement was to connect one level here, wasn't it? I'm sorry? We're not talking about two levels, an elevator connecting two levels. Right. Aren't we talking about one level from the street level to the concourse level? I think that's a bi-level. A bi-level. So we're talking about an elevator that has access to both levels. Right. But in this case, again, as we point out in our brief, at Suburban Station, Penn Center Concourse, SEPTA, in fact, installed two elevators. Yeah, but if I wanted access to the 15th Street Station and I were there at the 15th Street Station, in order for me to access the trains that go through the 15th Street Station, you say I had to go to take an elevator at the 16th Street elevator or the 7th Street elevator? You could take either one to get to the base of the 15th Street stair. Now, one thing that's important. If I get the elevator and come back to where I want to be, the distance of 680 feet. 340 feet. Well, right, 680. The 15th Street Station on the Market-Frankfurt Lawn, Your Honor, is not wheelchair accessible. The entryways that were made accessible drop to the Penn Center Concourse. There are seven public entrances. Two of those have elevators. And so what this allows someone to do is to navigate the full course of the concourse. Someone walks in, descends the steps at the 15th Street stairwell. That person must... At the 15th Street? 15th Street. Yeah. We refer to this, I think, as the stairwell in our brief, the 15th Street stair. It seems to be the focus here of the case, is that you can walk to the concourse level. That does not get you to the 15th Street Station. You have to take a left and climb up 11 steps until you get to the ticket area. Actually, in the record... Is your point that because you have to do more that that takes it out of the... I guess I'm having a hard time following the logic of that. How is that responsive to what Judge Fuente is asking, which I don't want to put words in his mouth either, but I think what he's saying is you've got to go 680 feet if you're in a wheelchair and you just walk down stairs if you're not in a wheelchair. Why is it relevant that you'd have to go up 11 additional stairs to respond to that question? Well, I think the project was to make concourse accessible. And what the guidelines require is that you have accessible entrances typically consistent with the public, what might be a regular public that's usable by all. And the guidelines require that at transportation facilities there needs to be only one accessible entrance. In this case, SEPTA built two. One over on... There's one elevator on JFK Boulevard near 17th Street, which drops directly down on top of one of the platforms in Suburban Station. The other elevator is built on 16th Street, midway between Market and JFK, goes to concourse level, centrally located in the concourse. And that concourse serves at least three stations. There's Suburban Station, there's 15th Street Station, you can get there, and you can also get to the 15th Street Station on the market on the trolley lines. It's not a pleasant trip, it seems to me. If I'm at 15th Street, I'm not terribly familiar with the overlay, but I'm just thinking 680 feet in a wheelchair, and if it's during rush hour and it's in a major transportation hub, this is not very pleasant. So I go back to the question, are you involved in an alteration? Is what you did an alteration so that you would be required to install an elevator there? No. The project, the scope of the project... No, because there is no load-bearing change... I've got two... In all candor, when this project was built at Suburban Station and Penn Center Concourse, the project scope was we're going to make Suburban Station accessible because SEPTA had designated Suburban as a key station, which obligated it to retrofit that station to make it fully accessible to individuals in wheelchairs. The scope of that project was hitting all of those public entrances in the Penn Center Concourse that feed into that station, and as a result, the regulations very clearly say one accessible entrance. It's all you need to a transportation facility. Here, SEPTA built two. At least one? At least... You're kind of leaving the words at least off when you say one accessible... The regulations require one, whether it's a new construction, whether it's an alteration... There's a difference between one and at least one, right? When you say they require one, that would mean, or it could certainly be... Red is meaning only one, but they actually say at least one, don't they? If I... I will double-check the language, but I think it's one. Okay. And I'm not sure whether it writes the at least one or not, but that is certainly construed in commentary of one accessible entrance, and that's what the Access Board says in its regulations, that we're not going to require more than one in issuing the regulations. I do have one. I have a question on a different topic with my colleague's indulgence. On page 41 of DIA's brief, they make the argument that under the guidelines section, and they point to 10.3.1.2 and to 10.3.2, that SEPTA is required to have made a change at the 15th Street Courtyard entrance because that entrance serves the Market-Frankford elevated line, which is a separate line from any line serviced by a suburban station. And I wanted to get your specific response to that assertion, that you don't get to rely on stuff at the suburban station end of things because they service suburban station, and Market-Frankford line is serviced by that 15th Street entrance. Right. I think I'd like to point the Court to sort of what is... how do we define the scope of the project here? And in the Sykes case, this Court defined it as what's degree of accessibility as defined by the regulatory standards is feasible within the scope of the project. And SEPTA submits that this project was the suburban station Penn Center concourse project. It was always designated as such running from 15th to 18th Street Market to JFK. We think SEPTA is entitled to define the scope of the project. Then the question becomes, you know, what degree of accessibility is required? And we say the regulation set the standard for what is feasible within that project. I don't... You know, one of the things the DOTs recognize in retrofitting these stations, in old cities it's extremely difficult to build these things, and the DOT gave agencies up to 30 years to comply with the key station provisions. And here it took SEPTA eight years to renovate the station. In the case of key station issues, if you're changing the 15th... if we were to say that the 15th Street change was an alteration, your response, I take it, is the 16th Street elevator is good enough because that will still service the Market-Frankford line. It's close enough. 340 feet, 680 foot round trip, it's good enough. Have I got that right? I think we're a little different. The argument is Penn Center Suburban Station is one project. That project was required to be made accessible. A key station retrofitting is a type of alteration. I think what the other argument is, even if you considered the 15th Street station to be part of the 15th Street stair, part of the 15th Street station on the Market-Frankford line, that there's no requirement to install an elevator because there were no major structural modifications to replace that stair. So that's the argument that it wasn't an alteration. Right, that's the argument. If we accepted that it was an alteration at the 15th Street stair, would you agree that if it is an alteration, then you needed to put in an elevator because then you were required to deal with that according to, as they point out, 10.3.2 and have a vertical access and accessibility to that Market-Frankford line? No, I think that 4.1.61F addresses the situation of installation. I would point critically, the district court here did not decide whether the 15th Street stair was part of the 15th Street station on the Market-Frankford line. DIA does not have a plausible claim here unless there is that factual determination because DIA's suit alleges violation of 42 U.S.C. section 12147A, which governs alterations of a subway station. So the district court's failure to make this finding of fact requires reversal on this basis alone. I promise one last question because I don't think I got my last question answered. Because when I said, would you agree that if it were an alteration, you were required to put in access because of 10.3.2 and that it services the 15th Street Market-Frankford line, and you said no and you went back to the definition that would say it wasn't an alteration. So what I'm asking you is, because I want to make sure I follow the logic that SEPTA's got, assume for the purposes of discussion that it is an alteration. If it is an alteration, is DIA correct in saying that under 10.3.1.2 and under 10.3.2, that means you had to put in an elevator? And if they're not right about that, that's what I'm asking about. Not going back to it's not an alteration. Right. There are certain types of alterations that require installation of an elevator. This is not one of them. The DOT regs and the guidelines define alteration in the definition section substantially the same way. What the guidelines do is provide specific scoping and technical requirements within those types of alterations. I think I understand that point. You're going back to the four-point whatever it is, right? I'm asking you to leave that behind, Ms. Benowitz. I want you to leave it behind and go with me this far. As a matter of logic, assume we were to say, hey, this is an alteration under the code. This is an alteration as defined by the statute and the regulations that are pertinent. Then my question to you is, if that is the case, are your opponents correct or incorrect about the import of 10.3.1 and 10.3.2? Because if they're wrong, I want to hear why they're wrong. That's the whole of my question. I think if this court decided that it was an alteration, again, setting aside our defense here, I think that there would have to be an elevator there. But again, I think under the regulations and the guidelines are the law here. I understand that point of your argument. Thank you. I have one yes or no question. The district court did not make findings of fact, but do not the 15th Street stairs lead provide direct access to the 15th Street station? I mean, is that really in dispute? It provides access. I mean, there's no doubt. The statute is written broadly, Your Honor. It says alteration to a facility or part of a facility that's used in the provision of transportation services. That's a yes. That's a yes. Thank you, Ms. Bennett. Mr. Gold. May it please the Court. My name is Stephen Gold with co-counsel Rocca Aicola. We have been litigating this case for eight years. This is the third time I've been before the circuit on a public transportation case. We'll give you more time if you wish. No, that's okay. Because of age, I'm sure. Thank you very much, Your Honor. A little background is really critical. In 1990, when the ADA was passed, the disability community wanted every transportation station and facility to be made accessible immediately. Whether the work was being done or not, a major congressional compromise occurred or was actually continued. And the compromise was as follows. When a public transportation system builds a new construction or makes an alteration to an existing facility, that triggers accessibility requirements. If they decide to do nothing to an existing facility, they don't have to do anything. Until SEPTA decided to change the 15th Street Courtyard and to change the escalator in the City Hall Courtyard, they had no ADA requirements to make it accessible. SEPTA controls it and shows when to do it. Part of that compromise requires that they build in accessibility when they so decide. The ADA has always been an incremental statute, meaning the following. Judge Fuentes, you will have access with an elevator at least to the concourse the way it's actually been drawn. You may even get it to where you can buy the ticket. You won't get it to the Frankfurt L in 2002. But in 2012 or 2015, when they redo the stairs from the ticket place down to the subway at Frankfurt L, that's when you'll get it. The same exact thing, same thing in terms of the subway. And if you don't put an elevator in when you do the alterations to one part of the level, then when you do the next part, you're not going to be able to get access. It sounds like a step-up. It's incremental. It's incremental, which makes good sense. But how about Ms. Bennett's argument and Judge Sirica's question? What if the expense is so high, so you might even call it outrageous or so disproportionate to the alteration that they're doing that they simply can't do it? I mean, is there a point where you say, I can't do it? Or a point where the agency is chilled because of the expense and decides not to do anything? Two things. First, the latter one. They decide when to do it. And part of a capital program is building in the cost for people who have disabilities, so that when you're doing alterations, it is much cheaper to make access than when you're not doing it. That's the first thing. But second thing, cost only, historically, only comes into play. It doesn't come in on maximum extent feasible. I think this circuit has clearly said that. Cost does not come in. It only comes in, as Ms. Bennett said, when you're altering the primary function and the path of travel. We're not claiming they ever altered the primary function. The primary function is the ticket place. We're saying that the alteration has nothing to do with triggering when the federal regulation at 37.43B, not A. We rely on the A, triggers in. There was no alteration to a primary function area. Therefore, cost doesn't trigger in, and case after case is so held. Obviously, the precedent you brought up. First, let me just say, having litigated both of them, that the DIA versus Sykes 23 years ago is exactly like this case. The northeast corner, it's broad and clumped here. There was a set of stairs prior to any construction. Was there a structural change in Sykes? No. You almost never get a structural change. Make sure you understand, a structural change is a load-bearing structure. What's wrong with Ms. Bennett's argument? What she doesn't understand about that is that, yes, the only time that a structural change triggers accessibility is when you put new stairs in. That doesn't mean that when you put new stairs in and you don't do a structural change, that you don't have to make it accessible. Judge Pratter got it right, and it makes no sense. The structural change is the most difficult thing to do, right? But because there are stairs being put in, ADAG said even in that circumstance. So you're saying Zepta's argument stands it on its head? Flips it on its head. I mean, it is correct to the extent that it says if there are new stairs and if there is structural alteration, then you have to do it. But that is really incredibly rare. The normal situation is there are new stairs and not structural. And what their argument would be is in the simpler cases to make it accessible, they have no duty to make it. Could you touch on this idea that their economic feasibility, or economics is a component of the feasibility of putting in the accommodation? Congress, this circuit, other circuits, have clearly said the one exception under the statute is to the maximum extent feasible. And the question that was part of the ADA, does that mean cost? And the clear congressional record saying no, this circuit I think in Tinney said no. Is that an absolute no? The reason, Judge Fuentes, is as follows. The accommodation is, let's say, 40 times the cost of the... It's never that. It's never that. I know it's a hypothetical, but do you not get to a point where the cost is so high that you... No, because you're dealing here with a civil rights statute. You're saying that's something they have to factor in. They have to factor it in. First instance. Correct. Isn't the technical feasibility, isn't that really a cost? I mean... Could be. I don't want to get too hung up on this, but by calling it technical feasibility, aren't you just calling it cost by another name? No. Aren't you? Because within the mind of man, isn't it possible to do all kinds of things if you're willing to invest the money? If somebody said, well, look, it's not technically feasible to widen that concourse, and somebody said, look, if you wanted to invest a billion dollars, you could go down there, you could blow out it, you could dig out additional rock, you could do that. It's within the realm of the engineering mind of man, but we won't do it because it would be so very, very, very expensive. To the maximum extent feasible is a technical defense that every transportation authority has, and it normally occurs, and it has occurred historically, when there has been a structural modification. Which means it's just too darn expensive to modify the structure, right? Probably right, yeah. Okay. But they haven't done it in terms of the cost to it, more in terms of the structure, because when you start talking about, and the greatest place to see the structure is the new Barnes building. Right now, it's gone up, and all these structural components are totally visible,  to put an elevator, you're absolutely, I'm not, It's really expensive. It's difficult, first you say it's difficult, but it's also expensive, of course. Can I ask you about the city as a party, if I might? Yeah. You seem to say that, oh, look, it's not a big problem if they're not in, because if the city really does balk at this after the fact, then they've got an impossibility defense, and in reading that, I wonder, well, if they've got an impossibility defense, then maybe the city really is a necessary party. How do we order relief that involves construction on the real property of a party that's not in the case? First of all, the city has been on notice of this case for eight years. They were part of the case with regard to the 15th Street. They are fully aware that we have litigated on the elevator on the city hall. They've chosen not to intervene. The question isn't what they're choosing. The question is what you're obligated to do. If you want the city to build on somebody else's property, aren't you obligated to get that property owner in the case? No, because they each have the duty under the ADA. That is, if the city had undertaken to do the subway, it would have been the city. But it was SEPTA that undertook to do the new escalator. Therefore, the duty to make it accessible is SEPTA. It's not the city. But I want to more frontally address your impossibility. It's not an impossibility. Whenever SEPTA or anyone makes changes, they have to go through, they have to apply for licensing, they have to apply for stuff, and the city looks at it and says, you know, this meets our code or doesn't meet our code. If in the absolutely extreme, extreme possibility that SEPTA, SEPTA is not going to say it's impossible. Let me make clear that SEPTA's engineers have said this is technically feasible. So it's not an impossibility. Has the city, Mr. Gold, at one point in your journey said, you know, it's okay, you can put the elevator there? The lawyers did. The lawyers for the city. Oh, yeah. We've been in constant contact with their lawyers on this one. Did you get it writing? No. I invited them to come today. I've invited them to intervene. You know, they don't have a problem. They voluntarily withdrew from it. Well, we had a stipulation that they had said that in terms of the 15th Street courtyard, they have no problem with it. I'm sorry. I thought they wanted to build an escalator or elevator at a different spot, Dilworth. The Dilworth Plaza, in terms of Judge Fuentes, did I get it in writing? When this case started, when the construction walls were up, and I asked the city and SEPTA, are you going to build an elevator? Riding my bike through, and they said, well, we hadn't really thought about it. The city said, well, we did, and we thought they needed one. And the oral agreement that was reached in 2001 was rather than build an elevator on 15th Street or City Hall, they would build a brand-new kind of accessible on the Dilworth Plaza, and if the DIA would accept it. We met. We said to them, okay, in lieu of two separate elevators, we'll take one as a compromise. And two years go by, they didn't do it. We called them up, and they said, oh, we changed our mind. And unfortunately, in terms of did I get it in writing, the personnel involved, one woman died, and the other person left the city and could not be found. So it was just like... I understand. It must have been a high frustration for certain people. No, with bad lawyering. We should have got it in writing. Judge Fuentes is right. But pertinent to the point of necessary parties, the fact that the city has agreed, yeah, Dilworth Plaza would be a good place is not the same thing as agreeing that City Hall is a good place. I agree with that completely. So the fact that there was an agreement before about one thing, perhaps, doesn't really tell us whether the city is going to be amenable to construction on their property, and that takes me back to the question of how can we really adjudicate rights associated with the property of an owner that isn't present? Well, you can adjudicate and find a discrimination and a violation of the ADA. What relief would we order? The relief is set to apply to the city and to do all the applications that they can. If the city objects in your hypothetical, under Rule 19 for the remedy phase of this litigation, they could then be brought in. But you don't get to the remedy phase until you find there's been a violation of the ADA. Was the 19A issue timely raised? It wasn't raised at all. It's never been raised in motion. It was brought up in oral argument. After the last time we were up here on the statute of limitations, it was brought up in oral argument on the cross-summary judgments, and then a letter was sent to the court, which is part of the record. It's never been raised by motion, ever. The same was before the district court, though, right? It was discussed, yeah. It was clearly discussed before, and Judge Prater was aware of it. Can I make... I'd like to make the following suggestion in terms of several things that Ms. Bennett brought up and my time is quickly running. There are several photographs that this court... When Judge Mansman was sitting in DIA v. Sykes, we looked for about seven minutes of that oral argument at the photos, the panel and I. May I suggest three or four pages of the appendix, not 60 pages of which are photographs. You can see the old courtyard, Joint Appendix 00788. You can see the alterations at Joint Appendix 00784 and 851. That's for the courtyard. And for the extent of work done on the city hall, I suggest Joint Appendix 920 and 924. These photographs tell the entire story. This was not a single element, as Ms. Bennett says. This was not anything at all dealing with the primary function. My time is quickly running out. No, no, you have more time. Let me suggest several things. I was delighted... If you read their briefs, as I'm sure you have, but their briefs never analyze, parse, distinguish Congress statute. They never analyze or parse the DOT regs. Now let me suggest, Judge Jordan, ADAG, the only DOT ADAG provision is the 10. All the other ADAGs that Ms. Bennett relies on deal with McDonald's, deal with everything else. They're generally applicable to all kinds of stuff, only DOT. And what DOT did in the regulation, the guidance, not the regulation ADAG, the guidance of ADAG, was to say that transportation access to different routes is critical. Isn't 10.3.2 and 10.3.1 aimed at new construction? Yes, it is. Does that make a difference in whether... Yeah, I don't think it mandates it. I don't think we win under 10.3. I think it strongly suggests what they were thinking. But I don't think you have to get there. I don't think you have to get to ADAG at all. You have to get to what did Congress say. And Congress said alterations. It gave them an exception for maximum extent feasible. You have to look at what the DOT regs. Their brief never, ever cites... Where is the best place to go for us to define alteration? At 37.3. It's a very broad term. 49 CFR 37.3 defines alterations. And as Judge Jordan asked the question, defines it exactly that way. But that only gets you was it an alteration. Then the next question that Judge Jordan asked correctly is when do you have to do it? And that you have to look at 37.43A. And it says when you do an alteration, remodeling, all this other stuff, and it affects usability and accessibility, then you have to make it accessible. And let me just say one thing that's really important. We're not just talking about people in wheelchairs. That elevators help people who use walkers, use canes. You have other ambulatory impairments that help you get up and down. And that's why Judge Fuentes, getting an elevator even down just to the concourse saves 25 steps. You know, that the person in a walker or a cane may have six or seven more steps to get up to where the primary function is that gets them halfway in 2002 to 2010. Judge Fuentes, you took my best line and asked a question. And it was the following. If under the ADA resurfacing of street triggers the usability, then how can a new set of stairs not do it? That is absolutely the critical question. If Congress did not mean for that to occur at that point, it doesn't make any sense. And I don't want to get into that. Let me address the suburban station quickly and their alternative arguments. We gave your opponent additional time. Thank you very much, Judge. Set this argument in terms of your question, Judge Jordan, is that because it's part of suburban station, 15th Street doesn't have to be made accessible. Now, and why is it part of suburban station? Because they defined it that way. Meaning you could define suburban station to go down to 16th and Locust if you could define it any way you want. Because once you get down to the concourse, you can go without any steps to 16th and Locust, to Broad and Walnut, to 11th and Market. I saw Judge, I think it was Judge Ditter, during rainy days walking from the Regional Rail underground all the way to 8th Street. This is an underground passageway. The fact that the 15th Street gets you to the same level as the 17th Street does, as does 16th and Locust, gets you to the exact same level is irrelevant. Either 15th Street Courtyard is a separate facility and they never judge Fuentes. The definition of facility is also at 9.3. They never raise it in their brief. They never parse it. They never parse what an alteration is under the federal regulations. And they sure as heck don't deal with 37.43a in their briefs. It's either a separate facility, in which case the alteration to the stairs requires it. And the reason you're pushing of Ms. Bennett was exactly where we're going to go on this argument. That is to say, once you define it as an alteration, as a separate facility, they have no argument. It has to be made accessible. So what they in fact have done then is forget the definition of facility and they say it's part of suburban station. But you don't even have to get to the 10, the ADAG 10 point whatever, because of the following. There are federal regulations that tell you that Ms. Bennett admitted this is a key station, suburban station. And if you look at 37.47, 49 CFR 37.47, defines key station. But it also says the following. It says even though you've made the key station accessible, when you're doing other alterations under 37.43a, they have to be made accessible. So you don't have to get to your issue of two different routes. But we think understanding what DOT was intending is very helpful in this situation. But clearly when you look at the key station federal regulation, that also says when you're doing alterations to it. But even assuming that the three words that they never talk about under these regs, it says a facility or part of a facility. There cannot be any question, unless we're living truly in Alice in Wonderland situation, that 15th and Market is at least a part of the suburban station facility, even assuming you accept their definition. In which case, when you make an alteration to a part of that facility, it has to be made accessible. Is there anything unique about the 15th Street courtyard in terms of transportation? In other words, can I go to 16th Street, a person who is not disabled, to go to 16th and 17th Street and get whatever transportation connection is necessary? So there's nothing unique about... Correct, but you could also go to 16th and Locust and take Patco. Without any steps, you can go to Walnut and you can go to 8th and Market. No steps. Okay, so if I'm at 15th Street and I happen to be disabled and I need to make a connection, I can go to 16th Street. Absolutely, you can. I don't have to walk back. No, if you go to 16th Street and you want to go, you have to walk back. For what purpose? To get on the 15th Street Market. The only reason the 16th Street helps you... So there is something unique about the 15th Street. Oh, if that's what you meant by unique, yes. I thought you meant... I misunderstood you, yes. If I wanted that line and I'm at 15th Street, I have to go there and come back. Absolutely, unequivocally. And if you used a walker or a cane or had cerebral palsy and your gait was really slow, this could be a nice jaunt and take quite a bit of time. Judge Eric has been more than kind. I've used it up. Let me just make... You may have answered this, but the District Court did not make a decision with respect to which facility the courtyard was a part of. Is that correct? Yes, that's correct. You say that's irrelevant. I mean, it is irrelevant in the sense that it's at least... That's why I gave at the end the alternate argument. It's either a facility unto itself, which the District Court did not... said she didn't have to do that, or it is a part of a facility the way they defined it. I have one question, if I might. Judge Prater has a footnote in which she discusses the burdens of proof and then says it really doesn't matter in this case. Did you agree or disagree with A, her analysis, or B, her conclusion that it doesn't matter here? Both. We have the burden. We clearly have the... Claimants have the burden to prove A, an alteration, and they have a defense of maximum extent feasible. We have the burden that it was an alteration. Okay. No question. Thanks. 1990, President Bush signs the ADA, and he says the following in the signing ceremony, that with the signing of the ADA, the walls of segregation will become tumbling down. That's the quote. It's a famous quote. If the 15th Street alteration with new stairs and the City Hall with a new escalator are not alterations that triggers the ADA, then the whole premise of equal access is a myth. Thank you. Thank you, Mr. Gold. Ms. Bennett. Thank you. I just want to make a few points. I think that the city is a required party here. It's not necessary. I think this court can consider that issue on appeal, even if not specifically raised by motion at the court below. The city owns the property. In order for SEPTA to even apply for a building permit, it has to show legal right to obtain that permit, and that's not going to happen unless there's an easement from the city with city council approval. Is the court ruling on that issue? I beg your pardon? Was there a district court ruling on that issue? In this particular case, the district court said it didn't think that it mattered that the city had not given permission, and SEPTA thinks it does. Did the district court rule on whether the city was a necessary party? No, it did not make a specific ruling on that. This was raised in post-briefing, sort of closing after an oral argument. Does that have to be decided in this case? I'm sorry? Does some possible recalcitrance on the part of the city have to be decided in this particular case? I'm not sure I understand your question, Your Honor. Well, you're saying the city may not agree with any installation. SEPTA has no legal right to even obtain a city permit until SEPTA shows it has legal right to do so, and in the absence of an easement from the city, which requires city council approval, SEPTA is not going to be able to apply for a building permit. I'm saying, does that all have to be determined in this lawsuit? I think it does, Your Honor. Well, your opponent, Mr. Gould, seems to indicate that's something that could be dealt with in terms of the remedy. And if I understood him right, I think maybe what he's saying is you can declare our rights, and then how they're enforced is a matter that comes up later. Why is that wrong? No, I think that's right. Actually, when you put it to me that way, I understand what you're saying. I understand what you're saying. But I think typically you would want the city to be involved in this case. Certainly at a remedy. Right. Certainly for a remedy. That's right. Judge Jordan, I wanted to respond to your question about the guidelines talking about a facility when SEPTA undertook the project at Suburban Station and Penn Center Concourse. And, again, I think what it's important to do is for you to look at the scope of the project. The regulation reads that the transit authority shall provide at least one accessible route from an accessible entrance. Now, perhaps you could respond to what Mr. Gold said in his argument, which is that even if we were to accept that this is part of the Suburban Street project, that this is nevertheless a later alteration to a part of that facility, and a separate portion of the regulation specifically requires you, if that is in fact an alteration, to make that part of the facility accessible. What's your response? Well, actually, the 15th Street stairwell work was done prior, not after, the Suburban project. So I think the issue is by the fact that it was completed a few years before the opening of the elevators, does that have an impact? And I would say no, because, again, as this court said in Sykes, the purpose is let's look at the scope of the project that's being undertaken. Okay. Well, if we were to agree with you that the temporality is not, well, let me ask it this way. I understood his argument to be, except for purposes of discussion, that this is part of the Suburban Street Station, the way SEPTA says. Whether or not it's part of a project associated with Suburban Street Station,  that doesn't matter because when they alter a part of that Suburban Street Station, they're still obligated to make it accessible. And I'm just wondering if you've got anything you want to say in response. Well, I think with respect, if the assumption is that this 15th Street stairwell is part of the Suburban Station Penn Center project, that there was no obligation to install an elevator there because, a couple of points, all of the what's required is there was no work going on in the platform to make it, you know, I say upgrade the primary function area, the platform level work. A lot of this work was asbestos removal, mechanical work, and the regulations say that, you know, if the point is you're trying to get folks to the Suburban Station train platform, you have no obligation to create an accessible route until you start those major renovations down on the platform. That's when the obligation kicks in. I just want to hit upon something about the regulations and what complies. I'll just point, the definition of alteration in the DOT regulations and the board's guidelines is the same. Section 1 of those guidelines mandates that the scoping and technical requirements are to be applied by transit facilities during the design, construction, and alteration of facilities covered by the ADA to the extent that the DO regs require that. And Section 10.1 of the guidelines, which specifically addresses transit facilities, states that transportation facilities, and I quote, shall comply with the applicable provisions of Section 4. So there's no doubt that Section 4 and that provision that we're relying on, and again, if you're looking at this as an entrance to the 15th Street Station, doesn't require installation of an elevator where you're not making major structural modifications or load-bearing walls. I mean, that's what you're really talking about here or any kind of load-bearing structure. What if you were just not changing the stairs or an escalator, but you were just replacing a door, renovating by replacing a door? The door? Yeah. Would you be making the same argument or would you not have to install, perhaps install an elevator? Right, I'd make the same argument. Isn't that an alteration? It is. It's an alteration to the door. An alteration of a stairs or escalator? Right. I mean, the regulations are written in such a way if you have to replace a doorknob because it's broken and the door itself is 28 inches wide, you replace the doorknob. You don't have to widen the doorframe to make it accessible to a wheelchair. And I want to read. That's not the question. You're relying on a reading of this Section 4 that says because it refers to load-bearing walls, it means you only have to have accessibility when you're putting in a staircase if it involves a load-bearing wall. And we've heard Mr. Gold's response to that. I'd be interested to hear your response to his argument. But I understand Judge Fuente's point to be, okay, assume it's not a staircase that's involved. Right. It's some other alteration. Right. You wouldn't have this argument, would you? Well, the question is what should SEPTA have done if it replaced the door? I guess that's the question. What should it have done? A door or a complete entrance that does not require a structural modification. Isn't that an alteration? It's an alteration of a particular element is how I would say it. And I know it's difficult. I mean, the regulations recognize that you can make piecemeal alterations without having to alter an entire space. But it doesn't seem to make sense that you would have to make an accommodation when you change a doorway, but you don't have to make it when you change the stairs. I mean, it just doesn't make sense. Well, maybe I don't understand your question. I think if you replace a door, you replace the door. Isn't that an alteration? It's an alteration to the door, yes. Is it an alteration that requires accommodation? If you replace the door and you're replacing the doorframe, if the doorframe's not wide enough to accommodate a wheelchair, a person in a wheelchair, yes, you would have to widen the doorframe to make sure that a person in a wheelchair could go through there. But you do make an accommodation there, but if you change the stairs, you do not have to make an accommodation. It's because you had an opportunity, because if you're moving the walls and the regulations, and I'd like to, if I can read some of the commentary that the Access Board has put. It talks about the ADAG sets minimum requirements for accessibility and alterations. New construction technical criteria are applied to each element or space altered where technically feasible. Compliance can be followed on an element-by-element basis, except where the work amounts to a full alteration of a room or space, in which case the room or space must be made fully accessible. This is from the 1991 guidelines. The Access Board has issued new guidelines in 2004. The Department of Transportation and the Department of Justice has just adopted those guidelines as a standard. And again, in the new regulations, in Advisory 202.3 alterations reads, although covered entities are permitted to limit the scope of an alteration to individual elements, the alteration of multiple elements within a room or space may provide a cost-effective remedy to make the entire room or space accessible. And I think there is the cost considerations are embedded in that requirement that there be major structural modifications. Point and example, the evidence in the record is that the cost of installing an elevator at the 15th Street stairwell would have been $800,000. The total cost of that project, the work done in there, was $1.5 million. With the escalator in City Hall, the cost to replace that escalator, again, very limited scope was digging out the guts of the escalator and extending the wellway, was $1.2 million. But there's evidence in the record that the cost of putting in an elevator would be $2 million, which would be more than the cost of the project. Was much of that cost funded by the federal government? I have no information. There's nothing in the record about how those costs would have been split. Ms. Bennett, any other questions?